[Crim. No. 3733. Second Dist., Div. One. Oct. 8, 1943.]

THE PEOPLE, Respondent, v. JOE CASILLAS, Appellant.

Ɉen Van Tress for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

WHITE, J.—Defendant was charged by information in two counts with the crime of rape and in two additional counts with the crime of incest. Counts I and II are predicated upon the same act of sexual intercourse, while counts III and IV are based upon a similar act upon another date. Following the entry of pleas of not guilty to all counts, the cause was tried before the court sitting without a jury, resulting in the conviction of defendant on all four counts. His motion for a new trial was denied. Upon each count the court pronounced a judgment sentencing the defendant to imprisonment in the state prison; execution of which sentence was thereupon suspended and the defendant placed on probation for the term of ten years. This appeal is prosecuted from the judgment and the order denying defendant's motion for a new trial.

It is first contended by the attorney general that because sentence was suspended and the defendant placed on probation the appeal from the judgment is ineffective. We do not so understand the law. Only in cases where no judgment is pronounced, and wherein, prior to the rendition of any judgment, the proceedings are suspended and the defendant placed on probation, is he deprived of his right to appeal except from the order denying his motion for a new trial, provided such a motion is made (*People* v. *DeVoe*, 123 Cal.App. 233 [11 P.2d 26]; *People* v. *Johnson*, 14 Cal. App.2d 373, 375 [58 P.2d 211]; *People* v. *Dawes*, 37 Cal. App.2d 44, 46 [98 P.2d 787]). Whenever, as in the instant case, a judgment is pronounced, the defendant may prosecute an appeal therefrom notwithstanding execution of such judgment is suspended and the defendant placed on probation. *People* v. *Guerrero*, 22 Cal.2d 183, 184, 185 [137 P.2d 21], relied upon by respondent, is not in conflict with the foregoing holding because in the last cited case the imposition of sentence was suspended, thereby resulting in no final judgment of conviction being rendered against the defendant, while in the case at bar sentence was imposed upon the defendant, thereby resulting in the rendition of a final judgment of conviction against him. In other words, in the case with which we are here concerned, it was the judgment and not the rendition thereof which was suspended.

The factual background surrounding this prosecution may be thus summarized: Defendant is the father of the complaining witness; she was 15 years of age on November 3, 1942. The defendant's family consists of his wife, the prosecutrix and five other children, the oldest of whom is 17 years of age. The entire family resided together in a two-bedroom, one-story house in the city of Los Angeles.

Except for the defendant's wife, who testified only as to the age and relationship of the prosecutrix to the defendant the only other witness at the trial was the prosecutrix.

In order that a clear picture may be presented of her testimony and in the interest of clarity regarding the situation that prevailed at the trial, we shall quote more or less at length from the reporter's transcript which discloses that on her direct examination the complaining witness was asked if she had an act of sexual intercourse with someone during the month of July, 1942, to which she replied in the affirmative. Thereupon the following ensued:

"Q. (by deputy district attorney): Oh, I see. All right. Now, you are pregnant at this time, are you not? A. Yes. sir.

"Q. Directing your attention to the month of July of 1942, did someone have an act of sexual intercourse with you? A. Yes, sir.

"Q. Who was it? A. (Answer inaudible.)

"Q. You have already stated before, you remember? A. Yes.

"Q. You tell this Court here. He is the one in charge of this trial. Tell him with whom you had intercourse. A. Well, I am not strong enough to say with who and I don't feel good to say with who I had it.

"Q. BY THE COURT: All right; who was it? (No answer.)

"THE COURT: Will you answer the question, please.

"Q. BY MR. HOPKINS (deputy district attorney): With whom did you have intercourse in the month of July, 1942; tell the Court. (No answer.)

"Q. You have stated here that you told this once. Now, you will have to tell it again, because we are in the Superior Court now. Tell the Court who had intercourse with you. Speak up, now. You are strong enough to tell this.

THE COURT: All right. Answer the question, please. (No answer.)

"THE COURT: Answer the question, please. (No answer.)

"THE COURT: Well, will you write it down?

"MR. HOPKINS: She can answer it, your Honor. Answer the question. (No answer.)

"THE COURT: Here, write it down just—— (No answer.)

"THE COURT: I am going to have to ask you to answer the question or either to write it down, one or the other. (No answer.)

"THE COURT: Well, do you know what we are going to have to do? We are going to have to have you up for contempt of court if you fail to answer his questions and refuse to answer them. Now, we don't want to have any difficulty with you. Answer the question, please. (No answer.)

"THE COURT: It may be necessary, if you don't answer the questions and still refuse to answer the questions that I will have to put you in jail until such time as you will. Now, I don't like to have to take those steps. Answer the question, please. Read it again, Mr. Reporter. (Question read.)

"THE COURT: Answer the question. A. With my dad. . . .

"Q. Where did he have the acts—where were you—strike that. When—how many—did you have more than one act of intercourse with him? A. Yes, sir.

"Q. How many? A. Two."

Thereupon the witness testified that the alleged offenses occurred in the month of July in her bedroom during the absence of her mother but while her younger sister was present. She was then asked "Did you ever have any act of intercourse with anyone else?" to which she replied "No, sir." The prosecutrix further testified that her father admonished her not to say anything about the two occurrences concerning which she testified and that she made no complaint until the occasion of a subsequent clinical examination by the juvenile authorities wherein she was found to be pregnant when she told a juvenile officer what had occurred.

On cross-examination the record reveals the following:

"Q. MR. SANSON (deputy public defender): Did you have intercourse with any other person? A. With a boy.

"Q. With a boy? A. Yes, sir.

"Q. Now, this is the first time that you have told about having an act with a boy, isn't it? A. Yes, sir.

"Q. Now, Irma, the truth of the matter is that the boy is

the one that caused you to have the baby, isn't it? A. Yes, sir.

"Q. What made you say it was your father? A. Because I wanted to protect the boy, that is why.

"Q. Who is the boy? A. I don't know. He went away. He is not here any more.

"Mr. Hopkins: What is that? The Witness: He went away.

"Q. By Mr. Sanson: Who is he? A. I don't know his name. His name is just Manuel.

"Q. What? A. Manuel. I don't know his last name.

"Q. Where did you have an act of intercourse with him? A. At home.

"Q. Did you tell anybody about that until now? A. No, sir.

"Q. How? A. No, sir.

"Q. Now, Irma, you came to my office with your father or your mother and all your brothers and sisters at one time, did you? A. Yes, sir.

"Q. And you said that you wanted to have your father turned loose? A. Yes, sir.

"Q. But you said that your father did that, didn't you? A. Yes, sir.

"Q. Did that act? A. Yes, sir.

"The Court: Answer out loud. The Witness: Yes, sir.

"Q. By Mr. Sanson: Now, Irma, is the reason that you wanted your father turned loose because you did not do it— because he did not do it? A. Yes, sir.

"Q. Now, are you being honest about that? A. Yes, sir.

"Q. Where did you hear anybody say anything about protecting the boy? A. No, sir.

"Q. You did not get anything like that from—— A. No, sir.

"Q. ——from what we talked about? A. No, sir. . . .

"Q. Your father did or did not have an act of intercourse with you? A. He did not.

"Q. When you went to the preliminary hearing, did you know that he did not? A. He did—I said he did.

"Q. Can you tell the officers and the court and the District Attorney how to find this boy that did? A. No, sir.

"Q. Why not? A. Because I don't know.

"By the Court: What is his last name? A. I don't know his last name. I just know him by his first name. . . .

"Q. By Mr. Sanson: How many times did this boy have intercourse with you? A. Twice."

The witness thereupon related the fact that she had met this boy while both of them were returning from school but that he did not attend the same school that she did; that he was about 17 years of age, that she did not remember his last name and knew him only as "Manuel."

Then the transcript discloses the following interrogatories and answers thereto:

"Q. It is all a lie about your father being in bed with you? A. Yes, sir.

"Q. Your father never did get in bed with you? A. No, sir.

"Q. Did you sleep alone or with somebody else? A. With my sister."

On redirect examination by the district attorney, the witness testified that she was protecting the boy "because I did not want him to get in trouble; that is why." The witness admitted that at the preliminary examination she testified that her father did commit the acts charged against him and when asked "That is right, isn't it?" answered "Yes, sir." However, the witness persisted in her claim that she did know the boy called "Manuel." Finally, on redirect examination the deputy district attorney asked: "As a matter of fact, you are just trying to protect your father now because you don't want to see him get into any further trouble; that is correct, isn't it?" to which the witness answered "Yes, sir." The court then inquired of the witness as to whether she was friendly with and fond of her father, to which she replied "Well, I have to like him, because he is my father, that is why." Thereupon the court asked "You feel that is your duty; is that right?"; to which the witness answered "Yes, sir"; and stated that she had never quarreled with her parent. On recross-examination the following occurred:

"Q. By Mr. Sanson: Did your father have an act of intercourse with you or did he not? A. He did once.

"Q. When? A. I don't remember.

"Q. Never had one twice? A. Pardon me?

"Q. Never had two acts of intercourse with you? A. No, sir.

"Q. Did he have one in July with you? A. Yes, sir.

"Q. Where was that? A. At home.

"Q. Why did you say that he had two acts with you before? A. Well, one boy did and he——

"Q. What? A. One boy did.

"Q. May I have that answer read? (Answer read.)

"Q. By Mr. Sanson: One he did? A. Yes, sir.

"Q. Which one? A. I don't remember.

"Q. Which one did the boy and which one did he do? A. Which one did he do what?

"Q. Which act—which time did your father have an act with you? A. I don't remember.

"Q. How many years ago? A. In July."

Finally, defendant's counsel asked: "Q. Irma Casillas, did your father, Joe Casillas, ever have an act of intercourse with you?" to which the witness replied "No, sir." The deputy district attorney having no further questions, the witness was excused.

Thus we are confronted with the spectacle of the complaining witness in a prosecution for rape and incest, without any corroborative evidence or incriminatory circumstances being shown, reluctantly testifying on direct examination, after being threatened with imprisonment for contempt, that her father committed two acts of sexual intercourse upon her; then on cross-examination denying that her father ever had an act of sexual intercourse with her and accusing a boy named Manuel of being responsible for her pregnant condition; that she had accused her father because she desired to protect the boy and did not believe her accusation against her father would result in any trouble for the latter. Then again on recross-examination, we have the witness testifying that her father had one act of sexual intercourse with her and the boy named Manuel also committed one such act.

In his summation of the evidence after submission of the cause for decision, the trial judge observed "In this case the complaining witness obviously was trying not to testify in this case against her father at all and, when she did, under considerable stress and strain, that was apparent, I think, to all, she said that her father was the one. She did not know this Manuel. She did not know anything about him except that he was one that appeared on the corner and went to school, and a different school, and she knew so very little

that that was clearly, in the mind of the court, a subterfuge to try to change her testimony that was so damaging against her father at the time of the preliminary hearing. She was beside herself. . . . but her testimony that he was the one on two occasions and then later said it was on one and then said that he did not at any time—the court has to consider that the last statement was made in attempting to do everything that she could to help her father. She was in a very perplexing position, and the court must find the defendant guilty on all charges in the information.''

In ruling upon the motion for a new trial, the court said *"In this case the testimony, as you stated, was entirely uncertain.* . . . after watching the witness, listening to the manner in which she testified, the court could come to no conclusion but that she was testifying to the truth . . . and that he had committed those acts. . . . Of course, I feel this way about the matter: While I feel—the way I decided the case—*it is quite a burden upon the court upon such unreliable testimony.* . . . I hesitated on the sentence that I must pronounce on all four counts in this case.'' (Emphasis added.)

■ It is at once apparent that in the personal opinion of the trial judge, the prosecutrix told the truth only in that part of her testimony wherein she accused her father of the horrible crimes charged against him. But causes cannot be legally decided upon personal opinions of those charged with that responsibility, and legal decisions must be made upon a judicial determination based upon legal evidence and recognized rules of law. Neither jurors nor judges, when acting as arbiters of guilt are permitted to base their decisions upon the existence or nonexistence of facts according to their personal beliefs or experiences, but only upon facts established by legal and competent evidence or upon inferences deducible from such proven facts as authorized by law. The personal opinion of the judge does not necessarily reflect the legal opinion of the court. Personal opinion may, and often times does, disregard law, but judicial determination depends for its accuracy and solidity upon prescribed principles of law and definite rules of procedure. ■ Conceding, as urged by respondent, that the trial judge has a wide discretion as the sole trier of facts in determining the credibility of witnesses and the intrinsic value of evidence, nevertheless that discre-

tion is a legal one, and the proper exercise thereof presents a question of law.

Before we could affirm the judgments of conviction under the state of the record before us in this case, we would be compelled to emasculate completely the doctrine of reasonable doubt, reference to which was at no time made by the trial court in arriving at his decision or in passing upon the motion for a new trial. In whatever light the testimony of the prosecutrix is viewed, it must be conceded that her testimony was, in one part or another, perjurious. She gave three separate, distinct and contradictory versions as to who ravished her and the circumstances surrounding the commission of the offenses. Without being unmindful of the rule that where the evidence, viewed in one light, creates a hypothesis inconsistent with guilt, and when viewed in another light such evidence is reasonably consistent with guilt, and where the jury, or in this case, the trial judge, adopts the hypothesis pointing to innocence, and there is legal evidence to support the implied finding of guilt as the more reasonable of the two hypotheses, this court is bound by the finding of the trial court or jury; nevertheless it is axiomatic as well that an appellate court may set aside the findings of the trial court when there is no substantial or credible evidence in the record to support them or where the evidence relied upon by the prosecution is apparently so improbable or false as to be incredible. When a case presents any of these features, this court deals with it as a matter of law.

That such a situation only presents itself in extreme cases we may concede, but we are convinced that the case at bar does not present the usual and ordinary situation where the evidence was in conflict as to the main or only issue, but on the contrary, tenders to us a case wherein the evidence is so lacking in substantiality as to truth or credibility that it falls far short of that quantum of verity, reasonableness and substantiality required by law in criminal cases to satisfy the reason and judgment of those bound to act conscientiously upon it as to the existence of guilt beyond a reasonable doubt and to a moral certainty. It must, therefore, be regarded as amounting to no evidence at all, as a matter of law, sufficient to overcome the presumption of innocence and to meet the burden resting upon the prosecution to establish guilt beyond a reasonable doubt.

The attorney general argues that the boy referred to by the prosecutrix as "Manuel" was a mere fiction of her imagination and was non-existent because she could not remember his last name, the school he attended or his place of residence. We are not impressed by that argument because the record reflects that at all times during her testimony the complaining witness was obviously attempting to shield and protect this boy from identification and consequent trouble with the law.

Respondent contends that the failure of the defendant to take the witness stand and deny the charges lodged against him is also a circumstance which the trial court was authorized to take into consideration in determining defendant's guilt or innocence. True, in criminal cases, the failure of a defendant to explain or deny by his testimony any evidence or facts in the case against him may be considered by the court, but that does not impair or deprive the defendant of his long recognized constitutional right not to be compelled to be a witness against himself (sec. 13, art. I, Const. of Cal.). A defendant, therefore, has a legal right, which he exercised in the instant case, to remain mute and rely upon the legal insufficiency of the testimony produced by the prosecution to establish his guilt beyond a reasonable doubt.

The judgments and the order denying defendant's motion for a new trial are and each of them is reversed and the cause remanded.

Doran, J., concurred.

York, P. J., concurred in the reversal and the remanding of the cause.