[Civ. No. 4068. Fourth Dist. Mar. 15, 1951.]

ROBERT W. HALL, Appellant, v. L. N. OSELL, Respondent.

W. E. James for Appellant.

Dorsey, Campbell & Bultman for Respondent.

MUSSELL, J.—Plaintiff operated a "for hire" flying service based at the Kern County airport near Bakersfield. During the early morning of June 19, 1947, the defendant hired

one of plaintiff's aircraft for the purpose of flying that day from Bakersfield to Santa Barbara, via Santa Maria, and return to Bakersfield.

The defendant, with his wife and daughter as passengers, "took off" from the Kern County airport for Santa Maria at approximately 11:30 a. m. and proceeded directly to the vicinity of Santa Maria, where, while the defendant was preparing to land, he flew the aircraft into a fog or cloud bank, and in attempting to make a turn, crashed it into a hillside approximately 10 miles southwesterly from Santa Maria. The aircraft was destroyed by the crash and plaintiff filed the instant action for damages sustained by reason of its destruction.

The cause was tried by the court without a jury and a judgment rendered for the defendant.

Plaintiff appeals, contending that the evidence is insufficient to support the findings and judgment.

The complaint sets forth four causes of action based on the liability of defendant as a bailee. The answer consists of a general denial and three special defenses in which contributory negligence and "unavoidable accident" are alleged.

### Facts

Defendant, who held a private pilot's license to fly a plane by "contact" rules only, arrived at the airport with his wife and daughter at about 7 o'clock a. m. on the day of the accident. He inquired as to the weather conditions and was told at the local United States weather bureau that the weather conditions over Santa Maria "would not allow flying." While waiting for a further weather report, defendant took his daughter and her girl friend up in the airplane for a 10-minute local flight in the vicinity of the airport. During this flight, the aircraft performed satisfactorily and defendant had no difficulty with it. At about 11:30 o'clock a. m., he obtained a clearance from the weather bureau for his flight and was informed that there was a broken cluster of clouds over Santa Maria, with a ceiling of about 1,300 feet. Defendant was then instructed by Mr. Webber, plaintiff's agent in charge of the airplane, that if the ceiling at Santa Maria was 1,300 feet or above, defendant should then proceed to the ocean, underneath the overcast, and thence follow the coast line to Santa Barbara; or, if the ceiling was less than 1,300 feet at Santa Maria, to land there and get further weather data and instructions before proceeding to Santa

Barbara; or, if the weather at Santa Maria "was too bad," to come back. ' Webber made a preflight inspection of the "whole" plane, after which he started it and defendant, with his wife and daughter, "took off." Defendant climbed to an elevation of about 8,000 feet, during which the airplane performed satisfactorily and gave him no trouble. After he passed over the range of mountains between the airport and Santa Maria, he idled the plane and glided down. When he approached Santa Maria, he could see scattered clouds and a fog bank to the south and west. At an altitude of approximately 1,500 feet, he sighted the airport to his left and started to land. He testified that when he started down to land, he went through a "big space" in the broken clouds and in the process of losing altitude, this cloud came in, "involving" the plane, confronting him "like a wave in the ocean." His altitude at that time was approximately 800 feet. He attempted to make a 180-degree turn, pushed the throttle in to get all the power possible, and nosed the plane up, and in less than five seconds the plane struck the hillside, at an elevation of somewhere between 1,000 and 1,300 feet.

The defendant testified that after "he nosed the plane up, the plane did not climb in the manner in which he was accustomed to have it climb. It was sluggish, not like I was accustomed to have it do." It is this testimony upon which the defendant relied and upon which the trial court concluded that the accident was due, in part at least, to a mechanical failure of the aircraft involved. This evidence is, at best, a statement of the witness as to his feeling at a time when he was obviously involved in a very serious predicament and he may well have felt under the circumstances that the plane did not respond sufficiently in the emergency. However, the record shows that in a matter of five seconds the plane actually was elevated at least 200 feet after being "nosed up" and while traveling at a speed of approximately 125 miles per hour, and there is no showing that it was not performing properly for such an aircraft.

The record further shows that the defendant was, by his license, limited to contact flying, which was defined as flying with reference to points on the ground; that he was familiar with the rules and regulations with respect to such flying; that section 60.30, subdivisions (a) and (b) of Civil Air Regulations (Code of Federal Regulations, title 14, Civil Aviation), Visual Flight Rules, provides as follows:

"Ceiling and distance from Clouds. Aircraft shall comply

with the following requirements as to ceiling and distance from clouds:

"(a) Within Central Zones. Unless authorized by air traffic control, aircraft shall not be flown when the ceiling is less than 1,000 feet, or less than 500 feet vertically and 2,000 feet horizontally from any cloud formation.

"(b) Elsewhere. When at an altitude of more than 700 feet above the surface aircraft shall not be flown less than 500 feet vertically and 2000 feet horizontally from any cloud formation; when at an altitude of 700 feet or less aircraft shall not be flown unless clear of clouds."

It is apparent that the defendant violated these rules, not only when he actually flew into the cloud or "fog bank" in which the aircraft was enveloped at the time of the crash, but also when he flew through scattered clouds while letting down for his intended landing at the airport. Furthermore, he was advised of the existence of scattered cloud banks over Santa Maria prior to undertaking the flight and was also advised to return to Bakersfield if the weather at Santa Maria "was too bad." Under these circumstances, it is apparent that the negligence of the defendant was the proximate cause of the accident and that the plaintiff, as bailor, was entitled to recover for the loss of his airplane.

As was said in *Baugh* v. *Rogers*, 24 Cal.2d 200, 215 [148 P.2d 633, 152 A.L.R. 1043]:

". . . it is elementary in the law of bailments that a bailee is responsible in damages to the bailor for any injury to the bailed property resulting from a failure of the bailee to exercise a proper degree of care in protecting it. (See *Milgate* v. *Wraith* (1942), 19 Cal.2d 297, 303 [121 P.2d 10]; *Brown* v. *Roland* (1940), 40 Cal.App.2d Supp. 825 [104 P.2d 138].) 'Where the bailment is for the sole benefit of the bailee, he is bound to exercise great care or extraordinary diligence' (8 C.J.S. 280, § 29; see also, Civ. Code, § 1886); and "Where, through negligence of the bailee, bailed property in his hands is injured . . . the bailor is entitled to recover such a sum as will reasonably compensate him for the injury sustained . . . ." (6 Am.Jur. 379, § 294; see, also, Civ. Code, § 1889.)"

The trial court evidently concluded that the accident was caused by the failure of the airplane to function properly and that the collision resulted through no fault or negligence on the part of the defendant. However, as heretofore noted, the only testimony in the record relied upon to establish such alleged faulty condition of the airplane was the quoted testi-

mony of the defendant. This testimony, in our opinion, is not of such a substantial character as to reasonably support the judgment. ■ The rule is that an appellate court will not interfere with the judgment where there exists a substantial conflict in the evidence. As stated in *Herbert* v. *Lankershim,* 9 Cal.2d 409, 471-472 [71 P.2d 220]:

"This rule, however, does not relieve an appellate court of its duty of analyzing the evidence in the light of reason and human experience and giving consideration to the motives and propensities which tend to influence or prompt human action, in an effort to solve the question as to whether the judgment is reasonably and substantially sustained by the evidence.

". . . There must be more than a conflict of mere words to constitute a conflict of evidence. The contrary evidence must be of a substantial character, such as reasonably supports the judgment as applied to the peculiar facts of the case. The rule announced in *Morton* v. *Mooney et al.,* 97 Mont. 1 [33 P.2d 262], correctly states the rule which has been approved by this court in a number of our decisions. It thus stated:

" 'While the jurors are the sole judges of the facts, the question as to whether or not there is substantial evidence in support of the plaintiff's case is always a question of law for the court (*Grant* v. *Chicago etc. Ry. Co.,* 78 Mont. 97 [252 P. 382], and in determining this question "the credulity of courts is not to be deemed commensurate with the facility and vehemence with which a witness swears. 'It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude the judgment.' " ' " "

Applying the rules announced to the situation before us, we find no substantial evidence to support the judgment and it is, therefore, reversed.

Griffin, Acting P. J., concurred.

A petition for a rehearing was denied April 12, 1951, and respondent's petition for a hearing by the Supreme Court was denied May 10, 1951. Gibson, C. J., and Carter, J., voted for a hearing.