[Civ. No. 20453.   Second Dist., Div. Two.   Feb. 14, 1955.]

MILTON C. WADE, Appellant, v. THE CITY COUNCIL OF THE CITY OF EL SEGUNDO et al., Respondents.

Finch, Bell, Duitsman & Jekel for Appellant.

Clyde Woodworth, City Attorney and Dunlap, Holmes, Ross & Woodson for Respondents.

FOX, J.—In this mandate proceeding plaintiff seeks to annul the order of the City Council of the City of El Segundo, revoking his permit to operate a dog kennel. He appeals from the judgment denying him relief.

In June, 1948, plaintiff was granted a license to operate a dog kennel within the city limits of El Segundo until March 31, 1949. Upon renewal of the license in 1949 the city council attached certain conditions thereto, among them being the following:

"First: That the said kennel must at all times be kept and maintained in a clean, presentable and sanitary condition and so as not to constitute a nuisance in any sense. . . .

"Third: That the permittee shall . . . have in attendance at said premises a person of proper age, capable of handling, and if necessary, of subduing the dogs . . ."

Plaintiff was familiar with the terms and conditions upon which the permit was granted and accepted the same upon said terms and conditions and agreed to be bound thereby. After the issuance of the original license, plaintiff spent a substantial amount of money in the acquisition of property upon which to operate his kennel and in making certain improvements thereon. The license was renewed from year to year until the city council gave notice to plaintiff ordering him to show cause before said council on June 17, 1953, why his license should not be revoked. A hearing was held on that date before the city council. That body thereafter made findings to the effect that: (1) the plaintiff failed to keep and maintain said kennel in a clean, presentable and sanitary condition; (2) that plaintiff kept sick and diseased dogs without sufficient attendants to properly and adequately perform the work of feeding, serving, nursing, treating, cleaning, ministering to and caring for the needs of such sick and diseased and other animals requiring attention in said kennel; (3) plaintiff kept some dogs in a state of malnutrition; and (4) plaintiff failed to adequately control the breeding of flies and

the accumulation of manure in and at said kennel premises. Based on these findings the council ordered the revocation of plaintiff's license.

Upon review of the proceedings before the city council the trial court found as a conclusion of law that "substantial evidence was offered and received which, if believed, would substantiate the findings that the plaintiff's kennel was not at all times kept and maintained in a clean, presentable and sanitary condition; that said kennel as operated by the plaintiff constituted a nuisance; that sick and diseased dogs were kept at said kennel without sufficient attendants capable of handling or caring for said dogs; that a substantial number of the dogs kept at said kennel were kept in a state of malnutrition." The court further concluded that plaintiff's permit had been validly revoked.

Counsel for both parties agreed that the only question involved is, Were the findings of the city council, upon which the order of revocation of plaintiff's license was based, supported by substantial evidence? It therefore becomes necessary to summarize the evidence which tends to support such questioned findings.

The first witness to testify before the city council was Dr. Wesley A. Young, a veterinarian. He graduated from Ohio State College in 1919 and was licensed to practice his profession in Iowa, Massachusetts, Illinois and California; in addition to private practice in Des Moines, he was state inspector of livestock for the State of Iowa; he was chief veterinarian of the Animal Rescue League of Boston from 1925 to 1936, and manager-director of the Anti-Cruelty Society in Chicago from 1936 to 1952, and from the latter date to the date of the hearing Dr. Young was western regional director of the American Humane Association. He is familiar with diseases of dogs and has been in charge of the operation of animal clinics where 10,000 to 15,000 animals were treated annually. He inspected the premises of plaintiff's kennel on April 16, 1953, in company with Mr. Theodore E. Brownlee, chief investigator of the Southern California Humane Society; there were 87 dogs in charge of one attendant. Dr. Young's testimony may be summarized as follows: The earth runs at plaintiff's kennels were fouled with feces; there were masses and quantities of hair that had come off the dogs; the earth had been dug up and out by the dogs over a considerable period of time to various depths, from inches to more than a foot in depth; offensive odors were noticeable. One attendant

cannot provide adequate care for 87 well dogs. There were numerous dogs which were sick and only three or four of the sick dogs showed any evidence of treatment, and the only treatment observable was the presence of an oil-like substance on their skins. Admittedly, this material had been placed on the dogs that very day—April 16, 1953; these dogs, being two boxers and one or two collies, were almost completely devoid of hair. Their skins were scaly, scabby and irritated, and clinically typical of mange. Other dogs showed similar skin lesions, including quite a number of chows, which showed loss of hair over a great deal of their bodies, particularly the tail, the rumps, down the hindquarters, their thighs and their ears. The ears of some dogs were sore, showing irritation from fly bites; others were dried, more or less hornified, and hardened skin over the dogs' ears, which could come only from a long standing condition. The general physical condition of these dogs showed improper or insufficient nutrition and chronic, long standing irritation of the skin from flies, fleas, insects, dirt and filth. A number of the chows showed inverted eyelids, i.e., lids that turn in so that the eyelash scrapes against the eyeball irritating the eyeball. This is a chronic condition which only surgery can cure or ameliorate. The attendant stated that only one dog had been operated on, and Dr. Young observed that surgery did not completely correct the condition on that one. None of the chows with this one exception showed treatment of any character. The general condition of the premises was filthy. They were neither presentable nor sanitary and about half of the dogs in the kennel were physically affected with some disease, varying from minor to major infections. Several of the animals were suffering. Two collies and one boxer could hardly walk. Eight or ten of the other dogs were extremely thin and one could count the dogs' ribs as far as the eye can see. There was evidence of cruelty in that there was lack of care and attention. A great many of the dogs showed evidence of malnutrition. The kennel was not being operated in a proper manner as kennels should be and this kennel could only be made to conform to acceptable standards by a complete renovation and rehabilitation, meaning cleaning out the filth and dirt, refilling with fresh, clean earth, and clean, sanitary maintenance thereafter. Proper operation would also necessitate treatment of the sick and diseased dogs and, as a matter of fact, it would be a hospital full of dogs. The ear conditions observed would take months to develop into such a chronic

condition. The apparent malnutrition could only have developed after neglect for months, the cases of mange would take weeks and weeks to attain such a condition, probably even months.

Dogs in one run could come into physical contact through the wire mesh with dogs in adjacent runs. A group of four or five one-third grown collie pups were subject to constant means of infection. The bulk of the dogs were fully grown, several of them being 7 or 8 and even 10 years of age.

The witness had seen thousands of dogs both in and out of kennels and as patients in clinics. The unsanitary character of the kennels, the physical appearance of the dogs' skin, their apparent malnutrition, their loss of hair and the condition of their mange necessarily required time to develop.

Mr. Brownlee, who had some 20 years' experience in feeding and treating dogs and had been in humane society work for four years, inspected the kennel twice on April 16, 1953, once in company with his assistant, Clyde Miles, and once in company with Dr. Young; and again on May 6, 1953. His testimony may be summarized as follows:

He and his assistant, Miles, observed a number of dogs, particularly chows, collies and two boxers, which were infected with skin disorders. Two collies had hardly any hair on their bodies. Lesions appeared to completely cover the dogs' bodies. The chows were infected, their ears were caked to the extent that in many instances there was dried blood on them. The hair was off their faces, off their necks, considerable off in spots on their backs, and some dogs had no hair whatsoever on their tails. A white boxer and a seven or eight week old boxer pup were completely covered with mange. Holes were dug in the ground showing that the place had not been cleaned or leveled off. About five dogs had matted hair which hung in clumps, whereas silky hair is characteristic of that type of dog when healthy. As a result of this inspection in the morning, Dr. Young was called in and made the afternoon inspection concerning which he testified.

On May 6th Mr. Brownlee again inspected the premises but no improvement was observed in the condition of the grounds or of the animals though inspection showed that some medication had been applied to two collies.

Mr. Miles, who had been a state officer of the Society for the Prevention of Cruelty to Animals since September, 1951, inspected the premises on April 6, 1953, and again

on April 16, 1953, corroborated the testimony of Mr. Brownlee. A portion of his testimony, in response to questions by City Attorney Woodworth, is as follows:

"Mr. Woodworth: Mr. Miles, upon that occasion that you observed the kennels, were they in a clean condition?

"Mr. Miles: They were not.

"Mr. Woodworth: Were they in a sanitary condition?

"Mr. Miles: They were not.

"Mr. Woodworth: In your opinion, were there sufficient attendants in attendance to properly care for the number of animals in the kennels at the time you observed them?

"Mr. Miles: No, sir, there weren't.

"Mr. Woodworth: Were there evidences of any filth around?

"Mr. Miles: There was in the runways, under the platforms [where] the dogs slept there was balls of hair all under it, hair all mixed up in the earth runways, and it did stink.

"Mr. Woodworth: Did you observe any animal feces there at that time?

"Mr. Miles: Yes.

"Mr. Woodworth: Any considerable amount?

"Mr. Miles: A lot of it was messed in with the earth."

It is conceded that there was no substantial evidence supporting the finding made by the city council that plaintiff failed to adequately control the breeding of flies. There was, however, substantial evidence to sustain the other challenged findings of the city council, and thus to justify the action of the city council in revoking plaintiff's permit. The testimony of Dr. Young, Mr. Brownlee and Officer Miles discloses the conditions they observed on their respective inspections of plaintiff's kennel. This testimony related to the unsanitary condition of the premises and the animals; it showed, in fact, that the premises were in a filthy condition, and that many of the dogs were afflicted with diseases, suffering from malnutrition and otherwise not properly cared for, and that adequate help had not been provided to take care of the kennel and the dogs. ■ It is true that some of the testimony on which the city council obviously relied consisted of the opinions of Dr. Young. It was proper, however, for the members of the city council to take such opinions into consideration since he was admittedly an expert in the field and had for his foundation the factual background which he had observed as to the conditions of the kennel and the dogs. Plaintiff's argument that his opinions as an expert were erroneous or unfounded in fact is without substance.

Dr. Young simply applied his professional training and long experience to a factual situation which he personally observed. This he was obviously qualified to do. The weight, of course, to be given to such opinions was a matter for the determination of the city council. ■ The observations of Dr. Young, Mr. Brownlee and Officer Miles, plus the expert testimony of Dr. Young, provided substantial evidence to support the findings of the city council, which, in turn, justified the revocation of plaintiff's license. Such evidence was credible and was unmistakably accepted as such by the members of the city council and reasonably supports the findings and determination of that body. It was, therefore, substantial in character. (*Fewel & Dawes, Inc.* v. *Pratt,* 17 Cal.2d 85, 89 [109 P.2d 650] ; *Oakley* v. *Oakley,* 82 Cal.App.2d 188, 190 [185 P.2d 848] ; *Hall* v. *Osell,* 102 Cal.App.2d 849, 853 [228 P.2d 293].)

Plaintiff has fallen into the error of relying too heavily on his own testimony and his explanations and excuses for the conditions that prevailed at his kennel. He was, of course, an interested party, and that fact could properly be and undoubtedly was taken into consideration by the members of the city council in weighing and evaluating his testimony. (*Tedder* v. *Johnson,* 105 Cal.App.2d 734, 739, 740 [234 P.2d 149].)

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.