[Crim. No. 6101.   Second Dist., Div. Two.   May 5, 1958.]

THE PEOPLE, Respondent, v. BEN I. RANKIN et al.,
Appellants.

Ellis D. Reiter and Burke Mathes for Appellants.

Edmund G. Brown, Attorney General, and Albert Bianchi, Deputy Attorney General, for Respondent.

ASHBURN, J.—Appellants were convicted of 10 counts of violation of section 26104, subdivision (a), Corporations Code, through the sale of undivided interests and issuance of certificates of interest in a mining title and lease without first securing a permit from the Commissioner of Corporations. Each appeals from the judgment and an order denying his motion for new trial.

Appellants' main argument is that there could be no violation of the statute because they merely induced the complaining witnesses to join with them in locating mining claims on public lands and collected $250 for each one-eighth fractional interest in consideration of their services in perfecting the filing, recording, monumenting and other acts necessary to

complete the claim through which they and the alleged victims acquired title as tenants in common; that their furnishing co-owners with copies of the location notices was not the issuance of a certificate of interest in a mining title or lease within the purview of section 25008, Corporations Code. As will appear, we find that the evidence justifies this factual contention in certain instances but not in others. Hence it first must be determined whether such a situation does violate the law.

Section 25008, Corporations Code, defines "security" as including "any certificate of interest in an oil, gas, or mining title or lease; . . . or beneficial interest in title to property, profits, or earnings." Section 26104, subdivision (a), declares every person guilty of a felony who " [k]nowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, . . ."

It is not the purpose of the law to stigmatize or to have the Commissioner of Corporations regulate every co-tenancy transaction. For instance, it specifically exempts " [a]ny partnership interest in a general partnership, or in a limited partnership . . . except partnership interests when offered to the public," and " [a]ny bona fide joint adventure interest, except . . . when offered to the public." (Corp. Code, § 25100, subds. (m) and (n).) ▮ "The Corporate Securities Law does not contain an all-inclusive formula by which to test the facts in every case. And the courts have refrained from attempting to formulate such a test. Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case. In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon. . . . ▮ An agreement to render personal services for compensation cannot be considered a security, even though the sale of a beneficial interest in such an agreement may come within the statute. . . . [N]either numbers of participants nor possible fraud in its creation may transmute the instrument into a security which in legal effect it is not. If fraud be involved redress must be found elsewhere than in the penal provisions of the Corporate Securities Law." (*People v. Syde*, 37 Cal.2d 765, 768, 769 [235 P.2d 601].) ▮ "It

has been the consistent policy of the state, as reflected in the various definitions of 'security,' to subject to regulation all schemes for investment, regardless of the forms of procedure employed, which are designed to lead investors into enterprises where the earnings and profits of business or speculative ventures must come through the management, control, and operations of others and which, regardless of form, have the characteristics of operations by corporations, trusts or similar business structures.'' (*Moore* v. *Stella*, 52 Cal.App.2d 766, 778 [127 P.2d 300].)

It is settled law that any deed, certificate of interest or like instrument of conveyance or assignment falls within the act only when it appears directly or inferentially that the buyer contemplates receipt of profits from activities of other persons, such as carrying on a business, drilling an oil well, or sinking and operating a mine; the mere conveyance to him of a fractional interest in a piece of land or other type of property is not subject to the statute if the buyer must look only to the thing bought or his own efforts to produce a profit to himself. The court, speaking through Mr. Justice Shinn, said in *Moore* v. *Stella*, *supra*, 52 Cal.App.2d 766, 772: ''A deed to mineral rights may or may not be a security. The determination of its true character requires an inquiry which goes beyond the mere name of the instrument or the nature of the interest conveyed. In deciding whether a given instrument is a security the courts have invariably looked through mere form to substance.'' Again, at page 777: ''In holding that the deeds to mineral rights issued by the defendants without a permit were invalid, we of course do not hold that every conveyance of a fractional interest in prospective oil land or of a segregated parcel thereof is a security or, more specifically, that it is a certificate of interest in an oil title.'' *Austin* v. *Hallmark Oil Co.*, 21 Cal.2d 718, 727 [134 P.2d 777] : ''If the transaction is one in which the assignee is merely an investor who for a consideration is given the right to share in the profits or proceeds of an enterprise to be conducted by others, the instrument representing such interest is a security. Where, however, as in the present case, the assignee is to share in the conduct of the enterprise, the instrument representing an assignment of a fractional interest in the production of oil is not a security within the act.'' (See also *People* v. *Davenport*, 13 Cal.2d 681, 685 [91 P.2d 892] ; *Domestic & Foreign Pet. Co., Ltd.* v. *Long*, 4 Cal.2d 547, 555 [51 P.2d 73].)

■ As a matter of general law the location of a mining claim upon public land vests in the locator or locators an estate which is the equivalent of a fee with respect to all persons other than the government. (*Watterson* v. *Cruse*, 179 Cal. 379, 382 [176 P. 870]; 33 Cal.Jur.2d § 83, p. 133.) ■ When made by or on behalf of a number of locators it amounts to a single claim in which each owns an undivided interest. (*Miller* v. *Chrisman*, 140 Cal. 440, 450 [73 P. 1083, 74 P. 444, 98 Am.St.Rep. 63].) ■ Such a joint location may be made by one of the participants on behalf of all. (*Moore* v. *Hamerstag*, 109 Cal. 122, 124 [41 P. 805]; *Morton* v. *Solambo C.M. Co.*, 26 Cal. 527, 528, 534; 33 Cal.Jur.2d § 50, p. 94.) ■ Such a location vests the specified interest in each named locator even though he did not authorize or know of it, provided he elects to ratify the same. (*Moore* v. *Hamerstag, supra*, p. 124; *Morton* v. *Solambo C.M. Co., supra*, p. 534; *Thompson* v. *Spray*, 72 Cal. 528, 530, 532 [14 P. 182].)

■ The evidence as to some of the counts in this case (I-IV) shows that defendants invited the complaining witnesses to join them in locating claims; that these persons paid their money upon that understanding; although they did not sign location notices each received at a later date a copy of such a notice or of a certificate of location bearing in type at the end of the document his or her name as a locator, followed by a fraction such as one-eighth or one-sixteenth. In those instances there was no representation before the transaction was completed that the claim was already in existence or owned by one of defendants, or that they were offering for sale an interest in an existing asset. The alleged victims so testified.[1] Early in the trial the following colloquy occurred

[1] In the case of Myrtle R. McLean (count I), the $250 was paid on August 4, 1954, and at that time she was given a location notice, typed in her presence, which acknowledged payment for her interest in Lucky Strike No. 2, and bore date August 9, 1954, as that of location; later she received from Rankin, through the mail, another copy of a notice of location which stated August 4, 1954 as the date of same, showed recordation on September 28, 1954, and was certified by a notary under date of November 29, 1954. As the witness testified that Rankin did not represent he was selling an interest in any mining claims but said he would fill in her name and the names of others as locators, and she understood she was to be one of the original locators, that she was acquiring an interest in a claim to be filed in the future, the placing of August 4, 1954, in the recorded notice (bearing her name as a locator) as the date of location does not amount to substantial evidence that the claim had been located by Rankin before his first conversation with her, or that he was purporting to sell an interest in an existing claim. (See as to what constitutes substantial evidence, *Guardianship of Sturges*, 30 Cal.App.2d

between court and prosecutor: "THE COURT: Well, it is the People's position that the testimony would be different on some other counts, then, than that ultimately given by the doctor. MR. ARTERBERRY: I think they are all similar; there's a little variation, but they are all very similar—I will say that. THE COURT: Well, do you agree with me? I notice the doctor in his initial testimony said that he was buying an interest in a lease, as he started out. MR. ARTERBERRY: He was buying an interest in this group of claims that were going to be located; that is what he said." Clearly, there was no sale of an interest in a mining title in the foregoing instances, and the furnishing of a copy of the mining location could not be a certificate of interest within the purview of the statute. It did not represent any interest sold or offered for sale by defendants. It amounted only to evidence of the title which vested in the locator through the location made for him in his name. The arrangement that defendants would make the location and include the other party's name as one of the locators was nothing more than a contract for services which, as pointed out in *People* v. *Syde, supra,* 37 Cal.2d 765, 768, cannot be considered a security within the terms of the act. To hold that the copy of a location notice furnished to the alleged victim was a certificate of interest within the meaning of the statute would exalt literal interpretation over the substance and spirit of the law. This is forbidden by *People* v. *Davenport, supra,* 13 Cal.2d 681, 685, and a legion of other cases. (See *People* v. *Villegas,* 110 Cal.App.2d 354, 357-358 [242 P.2d 657]; *In re Clarke,* 149 Cal.App.2d 802, 805 [309

477, 497 [86 P.2d 905]; *Citron* v. *Fields,* 30 Cal.App.2d 51, 63 [85 P.2d 534]; *Fewel & Dawes, Inc.* v. *Pratt,* 17 Cal.2d 85, 89 [109 P.2d 650]; *Hall* v. *Osell,* 102 Cal.App.2d 849, 853 [228 P.2d 293]; *People* v. *Casillas,* 60 Cal.App.2d 785, 793-794 [141 P.2d 768]; *People* v. *Stephens,* 117 Cal. App.2d 653, 659 [256 P.2d 1033].)

It was stipulated that the testimony of Emma P. Smith (count III) would be substantially the same as that of Miss McLean. Her money was paid to Rankin on August 16, 1954, and the notices given her bore the same dates as in the instance of Miss McLean.

Like stipulation was made as to the testimony of Lena A. Moulton (count IV), who paid her money on August 11, 1954, and later received through the mail a notice of location dated July 30, 1954, pertaining to Lucky Strike No. 1.

In the case of Dr. John R. Buckingham (count II), the transaction was had on October 6, 1954, and he later received copies of certificates of location showing locations made on December 12, 1954, with him named as one of the locators. He testified that he was one of the original locators and that this was understood at the time he paid over the money on October 6.

P.2d 142] ; 23 Cal.Jur. § 113, p. 734.) ''The letter killeth, but the spirit giveth life.''

Other transactions (counts V-X) cannot withstand the court's peering through form to substance. By that is meant that the evidence is in such shape that the judge was warranted in drawing inferences adverse to the defendants upon all the essential elements of the crime charged. Their failure to testify emphasizes the weight of such inferences. (*People* v. *Ashley,* 42 Cal.2d 246, 268 [267 P.2d 271].) The transactions with Marion R. Carter (counts IX and X) are illustrative. She turned over $1,750 to defendants at the rate of $250 for each one-eighth interest in a uranium claim. She testified at one place that defendants did not say they owned the claims, but she thought Rankin did own them, just assumed it; she did not recall if he actually said so; at another time she testified he said ''he had them located,'' ''said he has them,'' ''we have this and it is so good.'' She also said that Rankin sold the claims to her and Mrs. Jennie Smith and stated that the money was to be used for core drilling and developing the property; that they had turned down an offer of $4,000 plus a royalty for each claim; had had an offer to take over the claims for stock of a company. Rankin also said that every time he sold a claim he gave Garvin $50.

Mrs. Carter and Mrs. Jennie M. Smith (counts VII and VIII) were together when some of their purchases were made. Mrs. Smith testified that Garvin had telephoned her that Rankin had uranium claims he wanted to sell and that Garvin brought him to Mrs. Carter's home. There he said that Rankin had uranium claims to sell and the latter asserted they were worth buying. It was also said that Rankin was to work the claims and they (Mrs. Carter and Mrs. Smith) were to get dividends. Mrs. Smith also testified she did not know the difference between a claim already filed and one to be filed, but she thought the claims were already in existence. She also gave considerable testimony supporting defendants' claim that the two ladies were to join in locating claims and that it was not represented that any claims defendants presented to them were already in existence or being sold. Of course the trial judge had the right and duty of accepting and rejecting such parts of conflicting statements of any witness or witnesses as he deemed respectively credible or unbelievable.

''The trier of fact may believe and accept a portion of the testimony of a witness and disbelieve the remainder.

■ On appeal that portion which supports the judgment must be accepted, not that portion which would defeat, or tend to defeat, the judgment. (Citations.) ■ A judgment cannot be set aside on appeal unless it clearly appears that on no hypothesis whatever is there sufficient substantial evidence to sustain it. (Citation.)'' (*People* v. *Thomas,* 103 Cal.App. 2d 669, 672 [229 P.2d 836].)

■ Generally speaking, these same observations apply to the testimony of Mrs. Emma L. Miller concerning counts V and VI.

The court well may have concluded that the defendants were offering to sell to these women interests in existing mining claims. If they did so offer it is immaterial whether they owned the claims or whether the same actually were in existence. It is also fairly inferable that the buyers were to reap profits from the activities of defendants in developing and working a mine. Hence it would follow that the sale itself would violate the act. The testimony of Mrs. Smith, Mrs. Carter, Mrs. Miller, and the accompanying exhibits disclose that defendants cast each sale in the form of an agreement to make joint location of a new mining claim. But the trial judge was justified in piercing this form in order to view the realities and in concluding that these were sales of undivided interests in mining titles and violative of the act, as explained in such cases as *Moore* v. *Stella, supra,* 52 Cal.App. 2d 766; *Ogier* v. *Pacific Oil & Gas Corp.,* 132 Cal.App.2d 496 [282 P.2d 574]; *People* v. *Shafer,* 130 Cal.App. 74 [19 P.2d 861]; *McFaul* v. *Deck,* 30 Cal.App.2d 424 [86 P.2d 890]; *Domestic & Foreign Pet. Co., Ltd.* v. *Long, supra,* 4 Cal.2d 547; and *People* v. *Sidwell,* 27 Cal.2d 121 [162 P.2d 913]. In these circumstances the furnishing to each buyer of a copy of the mining location showing her to be a locator of an undivided interest constituted the issuance of a participation certificate in a mining title.

The transactions covered by counts I to IV, inclusive, of the information fall within the class first discussed herein. The evidence does not warrant a finding that there was a sale or the issuance of a participation certificate. The fact that defendants did not testify does not supply affirmative evidence against themselves; it only serves to fortify legitimate inferences flowing from evidence actually in the record (*People* v. *Ashley, supra,* 42 Cal.2d 246, 268); nor does the fact that transactions involved in counts V to X, inclusive, amounted to sales followed by issuance of participation certifi-

cates fill the hiatus in the proof on counts I to IV, inclusive. The evidence upon the former counts would be confirmative of adverse evidence upon the latter, but it cannot fill the gap therein. It might furnish one or more elements of the alleged crime but could not supply the entire structure.

The judgment and order denying new trial upon counts I to IV, inclusive, are reversed as to each defendant. The judgment and order denying new trial upon counts V to X, inclusive, are affirmed as to each defendant.

Fox, P. J., concurred.

HERNDON, J., Concurring and Dissenting.—I concur in the conclusion of the majority that the judgment and order as to Counts V to X, inclusive, should be affirmed. I dissent, however, from those portions of the majority opinion which hold that the judgment and order should be reversed as to Counts I to IV, inclusive.

Discussions between court and counsel in the court below as contained in the record before us discloses that the learned trial judge had clearly in mind the well settled rules of law by which it is to be determined whether the instruments involved are "securities" within the purview of the applicable statute or whether they represented interests in a bona fide joint venture, which are expressly exempted from its application. The evidence supporting the trial court's judgment on all counts impresses me as being not only substantial but clear and convincing.

I find myself in complete accord with the apparently unanimous view of counsel for appellants, the district attorney, the attorney general, and the trial judge that all ten transactions are substantially the same in character. As appellants correctly state in their opening brief, "[T]he testimony given by all of the witnesses was very similar in context." And the district attorney responded as follows to the inquiry of the court below whether the testimony on the other counts would be different from that given by the first witness with reference to Count II: "I think they are all similar; there's a little variation, but they are all very similar—I will say that."

As I view the record, all of the transactions described in the testimony of the seven elderly witnesses are essentially the same, both in form and in substance. It is unmistakably clear from the record that the conduct of the appellants with reference to each and every one of said transactions

constituted a part of a common plan, scheme, and design so that the evidence as to each is competent to prove the unlawful intent of the others and to prove the illegality of the scheme as a whole. (18 Cal.Jur.2d § 138, p. 588, and cases cited.) The lack of any material difference in the transactions and their identification with the common scheme is further emphasized by the fact that some of the sales involved in the first four counts related to interests in the very same mining claims which are involved in the last six counts.

As will be shown by a summary of the evidence relating to Count I, shortly to be set forth, the scheme is a classic example of a common form of swindle technique. Quite typically, six of the seven victims who testified at the trial were elderly women. The essence of the scheme was to cast the transaction in such form that the victims would appear to be bona fide joint venturers with appellant Rankin in locating and perfecting mining claims upon portions of the public domain whereon Rankin, as he represented, had previously discovered rock rich in uranium content. In all instances, the "investors" were cast in the role of original locators and appellants have sought to characterize the payments of $250 for each fractional one-eighth interest as contributions to the costs and expenses of locating, perfecting and developing the claims. All of the victims received documentary evidence of their interests in the form of copies of location notices showing them as locators and setting forth their respective fractional interests. In form these "muniments of title" were essentially the same in every instance.

The record reveals that nearly all of these purported "joint venturers," other than Rankin, were complete strangers to each other. Except for Mrs. Jennie Smith (Counts VII and VIII) and a Miss Marion Carter (Counts IX and X), who were friends, the complaining witnesses met for the first time when they appeared in court to testify at the preliminary hearing.[1]

The victim of the transaction involved in Count I was Miss Myrtle McLean, a retired clerk-typist. She had known defendant Garvin for several years. On or about August 9, 1954, Garvin brought defendant Rankin to her home and introduced him to her. The following excerpts from Miss McLean's testimony will more adequately describe the pres-

[1]The evidence discloses that there were numerous other participants in addition to the seven whose "purchases" or "contributions" were the subjects of the ten counts of the information.

entation: "Q. Well, when they came in, who spoke first? A. Mr. Garvin did. Q. What did he say? A. Well, he introduced me to Mr. Rankin. Q. What did he say about Mr. Rankin? A. Well, he had some claims of uranium and wanted to talk to me. Q. Did he tell you who Mr. Rankin was, or anything about him? A. Well, he told me that he had known him for a long time. Q. Yes? A. And they showed me some credentials. Q. What kind of credentials were they? A. Well, I didn't read the whole letter; it was in regard to an executive position with some company—oil company. Q. What oil company was it? A. I think it was Standard. Q. Standard Oil Company in Nevada? A. I think so. Q. What position did he hold with the Standard Oil Company in Nevada? A. Well, I understood it was the vice president, or some such—some such office; I don't remember now. Q. Go ahead and tell the court now as near as you can everything they told you about these uranium claims. A. Well, I can't remember everything that was said. . . . He explained the whole thing to me, you know—that it was—the potential, and so forth. . . . And it all sounded very good to me; so I purchased an interest. Q. And what interest did you get? A. An 8th interest. Q. In what? A. In three claims. Q. In three claims; and what did you pay for that interest? A. $250.00. Q. How did you pay it? A. I paid it in cash."

The following are excerpts from Miss McLean's testimony given on cross-examination: "Q. Mrs. McLean, when you first discussed the matter with Mr. Rankin, did he tell you that he was getting a group together, or ask you if you would like to join some other parties in filing on some uranium claims? A. Well, I assumed that there were other parties asked to join in the group. Q. And did he tell you that you would be a locator of the claim, or one of the parties who would be locating some claim? A. I didn't get that. Q. I say, did he tell you that you would be one of the original locators of the claims? A. Well, that's what I understood. Q. And he didn't tell you that he was selling you an interest in any claims—any mining claims? A. No. Q. All right; now, at the time he got the second $250.00, did he not tell you that that was needed for the location and assessment work? A. That's right. Q. And it was not for the location work—in other words, one of the $250.00 was for the first location of the first claim, and then there was a second one for another $250.00? MR. ARTERBERRY: I didn't so understand her testimony. MR. SEAY: I am trying to refresh her; it's a little

confusing to me. THE WITNESS: I paid $250.00 for the claims at first, and then $250.00 for assessment work; and that's all I paid.''

It will be observed that Miss McLean's testimony is somewhat self-contradictory as to whether at the time she paid her first $250 she understood the claims to be ''then existing'' or thereafter ''to be located.'' Since to my mind it is wholly immaterial whether defendants' representations and her understanding relative to this detail was one way or the other, I shall assume the correctness of defendants' version of her testimony in this respect. The same confusion appears in the testimony of several of the aged witnesses.[2] For example, Miss Marion Carter (Counts IX and X) testified as follows in response to questions of the district attorney concerning one of the several[3] checks for $250 which she had issued to appellant Rankin: ''Q. And on the back it bears the endorsement of Mr. Rankin. Tell the Court what that was for. A. That was for an eighth claim, or the expenses on an eighth claim of uranium. Q. Well, now, which was it? Do you know, or are you able to state which it was? A. Well, it was all the same to me; it was ⅛th claim, and I knew that it was for monuments—some of the money had to go for monuments and different work on the claims, or drilling, maybe; it was for ⅛th claim of the uranium; whatever it was—the area or district.''

Miss McLean did not recall signing any document at any time, nor did she receive any document at the time she paid over her money to the defendants. Shortly thereafter, however, she received through the mail from Rankin a document on a printed form entitled ''Notice of Location'' dated August 4, 1954, locating a claim to be designated (quite euphemistically) as ''Lucky Strike No. 2.'' The location notice carried as ''Names of Locators'' the names of Rankin, Myrtle R. McLean and two other women. After the names of the ''locators'' other than Rankin were designations indicating their interest as ''¼ interest,'' or ''⅛ interest.''

Thereafter, Miss McLean received from Rankin through the mail the documents identified at the trial as People's

[2]As the majority opinion points out, substantially the same conflict appears in the testimony of Mrs. Jennie M. Smith, whose purchases were the basis of Counts VII and VIII.

[3]Miss Carter, who had been a nurse for about forty years, invested at least $1,500. The ten sales charged in the information were only representative examples of a much larger number.

Exhibits Numbers 6 and 7. Exhibit Number 6 was dated December 12, 1954, and headed "Certificate of Location." It certified that Lucky Strike Number 3 was located by Rankin and others, and bore the names of Rankin, McLean and three others with fractional designations after each name of ½, ⅛, or 1/16. Exhibit Number 7 was dated August 9, 1954, and was headed "Location Notice—Lode Claim." It purported to give notice of the location and claim of "Lucky Strike No. 2" and at the foot it designated the locators as follows: "Ben I Rankin Tonopah Nevada Fishlake Valley RT Myrtle R. Mc.Clean. 5748. 7th Ave. L.A. 43 Ca as locator of ⅛ interest of the above claim

Luckystrike No. 2. Rec Payment for *intrest* to date.

| Locator | Address |
|---|---|

Witness: s/Ben I. Rankin"

In my view, the trial court was amply justified in finding and holding that defendants sold to Myrtle McLean a security in the form of an interest in a mining title. The documents which she received through the mail quite obviously were designed to serve the office of "certificates" in the sense that they were intended to evidence and represent the investor's ownership of the indicated interest in the mining claims described and her right to participate in the earnings and profits thereof.

The effect of the majority opinion with respect to Counts I to IV is to sustain appellants' argument that the transactions amounted to a bona fide joint venture in that appellants merely invited the complaining witnesses to join with them in locating mining claims on the public domain, and collected $250 for each one-eighth interest in consideration of appellants' services in perfecting the claims by monumenting, recording and filing the notices of location, etc.

There is a short answer to this argument. Even this description of the transactions in the light most favorable to appellants portrays illegal sales of interests in a mining venture. Obviously the documents which appellants delivered to the "investors" were intended to evidence the respective interests which they were acquiring. Hence, they are securities within the definition of subdivision (a) of section 25008 of the Corporations Code, which includes "(a) . . . any certificate of interest or participation; any certificate of interest in a profit-sharing agreement; any certificate of interest in an

oil, gas, or mining title or lease; any . . . investment contract, or beneficial interest in title to property, profits, or earnings.''

Appellants have sought the shelter of subdivision (n) of section 25100 of the Corporations Code which exempts from the application of the Corporate Securities Law ''[a]ny bona fide joint adventure interest, except such interests when offered to the public.'' But the evidence in this case is more than sufficient to support findings (1) that there was no bona fide joint venture; and (2) that the interests sold were ''offered to the public.'' It is apparent from the record that appellants offered and sold these interests indiscriminately to a large number of people who were total strangers to each other. As I shall point out shortly, the transactions bear none of the hallmarks of a true joint venture.

As stated in *People* v. *McCabe,* 60 Cal.App.2d 492, 498 [141 P.2d 54] : ''If such a writing so issued by an individual creates a present right to a present or a future participation in the profits of an enterprise undertaken for profit it is a security under the act. The fact that the interest in the profits conveyed was not to be realized until the sale of the process does not make it any the less a security. (*People* v. *Oliver,* 102 Cal.App. 29, 36 [282 P. 813] ; *People* v. *Claggett,* 130 Cal.App. 141, 143 [19 P.2d 805] ; *People* v. *Shafer,* 130 Cal.App. 74 [19 P.2d 861].)''

To my mind, it makes not the slightest difference either in reason or in law whether the present right to future participation in the profits of the mining venture appertained to claims which had been ''located'' in the legal sense, that is, by the erection of monuments, etc., or to claims which Rankin intended to locate upon land known to him and upon which he claimed to have discovered mineral. Discovery of mineral is the first step in a series of steps that must be taken to perfect a mining title. (*Adams* v. *Crawford,* 116 Cal. 495 [48 P. 488] ; 33 Cal.Jur.2d § 55, p. 100.)

Thus, it makes no practical or legal difference whether the sale of the interest was made before or after the claim was located in the legal sense. As stated in *People* v. *Oliver,* 102 Cal.App. 29, at page 36 [282 P. 813] : ''If the instrument of sale creates a present right to a present or a future participation in either the income, profits or assets of a business carried on for profit, it is a 'security' as defined in the Corporate Securities Act. Because the interest created will not return a profit until the performance of a future act, such as the sale of an interest in a patent, or the grant to a

licensee of the right to use it, does not bring it without the provisions of this act. (*Agnew* v. *Daugherty*, 189 Cal. 446 [209 P. 34].) To hold otherwise would make the real test of the legality or illegality of the sale the ultimate success or failure of the venture. The law was passed to protect the investors against unprincipled promoters, as well as to keep valueless securities off the market. It is the act of selling that is primarily placed under the examination of the commissioner of corporations, and his action in granting or withholding his permit to sell cannot be made contingent upon the future success or failure of the business venture. To hold otherwise would put a premium on fraud and permit a promoter to sell a mythical security without any intention of ever attempting to engage in the business in which he purported to sell an interest.'' To the same effect are *People* v. *Shafer*, 130 Cal.App. 74, 76 [19 P.2d 861] and *People* v. *Jaques*, 137 Cal.App.2d 823, 832 [291 P.2d 124].

Certainly it was not contemplated that this mining venture would be completed or terminated when the claims had been located and perfected. Quite obviously the location of the claims was only the beginning of the venture. The investors were led to envisage earnings and profits.[4] The record is replete with evidence that plans for development, for the construction of a mill and for the shipping of ores were discussed with various of the investors at various times.[5]

Thus, we are led logically to a consideration of the test laid down in the following language from *Austin* v. *Hallmark Oil Co.*, 21 Cal.2d 718, 727 [134 P.2d 777]: "If the transaction is one in which the assignee is merely an investor who for a consideration is given the right to share in the profits or proceeds of an enterprise to be conducted by others, the instrument representing such interest is a security. Where, however, as in the present case, the assignee is to share in the conduct of the enterprise, the instrument representing an assignment of a fractional interest in the production of oil is not a security within the act.''

---

[4] Mrs. Jennie M. Smith, who also had worked as a nurse for 40 years, ''invested'' $1,400. Rankin told her that she could expect to begin receiving her ''dividends'' by March of the following year. Garvin promised Miss Carter that she ''would be getting royalties before Christmas,'' but Rankin thought these ''royalties'' might not be forthcoming before the following March.

[5] After he had made his investment, the witness Buckingham received letters from Rankin telling of plans regarding the building of a mill, the shipping of ore, etc.

The foregoing test is entirely consistent with the declaration in *Moore* v. *Stella*, 52 Cal.App.2d 766, 778 [127 P.2d 300], that it is the policy of California law as indicated by the various definitions of "security" to subject to regulation "all schemes for investment, regardless of the forms of procedure employed, which are designed to lead investors into enterprises where the earnings and profits of business or speculative ventures must come through the management, control, and operations of others. . . ."

Manifestly, it was contemplated that the "management, control and operations" of the mining claims involved in this case would be left in the hands of the defendants. Any suggestion that the parties contemplated active participation in these operations by the six elderly ladies or by the practicing physician would be little short of ridiculous. The test laid down in *Austin* v. *Hallmark Oil Co., supra,* 21 Cal.2d 718, 727, is designed to differentiate between an investment in an enterprise to be conducted by others and a participation in a joint venture. The question whether a joint venture was created was primarily one for the trial court to determine from the evidence and the inferences reasonably to be drawn therefrom. (*Goldberg* v. *Paramount Oil Co.,* 143 Cal.App.2d 215, 220 [300 P.2d 329].)

There seems to be no disagreement concerning the oft-stated principle that the courts will look through the form to discern the true substance of a transaction. It seems to me that no X-ray vision is needed to see through the transparent subterfuge of form with which the defendants in this case attempted to camouflage the transactions here involved. In the last analysis, none of them amounted to anything more or less than sales of interests in uranium mining ventures from which the purchasers were led to expect early returns in the form of "royalties" or "dividends."

I would affirm the judgment on all counts.

The petition of appellant Joseph B. Garvin for a hearing by the Supreme Court was denied July 2, 1958.